IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| J.T.M., Children's Legal Center, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Alejandro Mayorkas, Secretary of Homeland Security; Tae D. Johnson, Acting Director U.S. Immigration and Customs Enforcement; John Does 1-10.<br><br>Defendants. | Case No. 1:22-cv-00774<br><br>**Jury Trial Demanded** |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, by their attorneys, Seyfarth Shaw LLP, allege as follows:

**INTRODUCTION**

1. Plaintiffs bring this action to redress Defendants' violation of the rights of a class of individuals in removal proceedings under the Fourth and Fifth Amendments of the United States Constitution and Defendants' arbitrary and capricious actions in violation of the Fourth Amendment, Fifth Amendment, and the Administrative Procedures Act, 5 U.S.C. § 500, *et seq*.

2. In July 2006, U.S. Immigration and Customs Enforcement ("ICE") promulgated a memorandum regarding confiscation of government-issued documents held by persons in removal proceedings.

3. In August 2006, ICE promulgated a revised memorandum (ECF No. 18-2), due to revisions as to the Aliens Under Supervision subsection.

83951313v.6

4. Despite the Memorandum's issuance in 2006, it was widely enforced until approximately 2018 or 2019. It was only then that Children's Legal Center ("CLC") staff became aware of the ICE memorandum and began to encounter problems with return of documents to their clients.

5. Plaintiff J.T.M. likewise was not impacted by the Memorandum until he entered the United States in 2019.

6. The memorandum purports to give certain ICE or other immigration enforcement officers discretion to indefinitely retain such documents held by individuals in removal proceedings regardless of whether the holder of the document is legitimately entitled to the documents and regardless of whether the holder poses any kind of flight or other risk. In fact, many migrants, including J.T.M., were released from custody, which reflects a governmental judgment that they did not present a flight or safety risk.

7. ICE's policy and the standard-less implementation of it by ICE officers place extreme burdens on individuals in removal proceedings, including imposition of additional obstacles to obtaining benefits (such as employment authorization, public education, and other public benefits) and relief to which they otherwise would be entitled.

8. Additionally, the policy and its implementation impose additional costs burdens on organizations, including Plaintiff Children's Legal Center, in connection with their representation of individuals in removal proceedings because they force CLC to undertake additional work in order to obtain original or duplicate documents that have been seized by ICE.

## JURISDICTION AND VENUE

9. Jurisdiction lies with this Court under 28 U.S.C. § 1331 because Plaintiffs allege violations of federal statutes and the United States Constitution.

10. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois. Additionally, Defendants are officers of the United States, the action does not involve real property, and Plaintiff CLC resides in this District.

## PARTIES

11. Plaintiff Children's Legal Center ("CLC") is an organization dedicated to providing free legal services and representation to children in the immigration process. Its services cover family members as well, since children are safe only when they have a parent or caregiver that is able to provide safety for them. CLC provide holistic services to clients through its partnerships, including securing access to legal services, mental health services and housing.

12. Plaintiff J.T.M. is a resident of Granton, Wisconsin and is currently in removal proceedings.

13. Defendant Alejandro Mayorkas is the Secretary of Homeland Security

14. Defendant Tae D. Johnson is Acting Director of ICE.

15. Defendants John Does 1-10 are ICE agents and/or contractors who have confiscated and refused to return Plaintiffs' documents pursuant to ICE policy. The identities of John Does 1-10 are not currently known to the Plaintiffs, but are expected to be identified through discovery in this matter.

## FACTUAL BACKGROUND

### The Torres Memorandum

16. In July 2006, John Torres, then-Acting Director of U.S. Immigration and Customs Enforcement issued a memorandum entitled "Confiscation and Return of Original Documents." A copy of the memorandum is attached as Exhibit A.

83951313v.6

17. The Memorandum notes that when individuals are placed in removal proceedings, ICE typically confiscates identification documents. Additionally, it sets forth guidelines to determine whether and when to return the documents.

18. The Memorandum provides that in making the return determination, the ICE officer has to consider whether the individual in question may legally possess the document and whether ICE has an operational need to retain it. For documents legally possessed by aliens, the Memorandum states that the determination with respect to returning the document should turn on "the alien's stated need for the document and whether release of the document will compromise ICE operations."

19. The Memorandum further provides that for all individuals who are not Lawful Permanent Residents (LPRs), ICE "may retain domestically issued government documents … at [its] discretion" on the basis that "unlawful possession of such documents" gives the holders "the appearance of legitimacy."

20. However, the Memorandum does not provide details on the exercise of discretion and does not limit that discretion to unlawfully held documents.

21. In August 2006, ICE promulgated a Revised Memorandum (ECF No. 18-2).

22. The Revised Memorandum is substantially identical to the original Memorandum with respect to the allegations in Paragraphs 17-20.[1]

## Subsequent Events

23. In the experience of CLC staff, prior to July 2018, the Memorandum was not widely or consistently enforced. Some migrants were allowed to retain documents when released from custody. Additionally, ICE generally returned identification documents to non-detained

---

[1] Because there is no substantive difference between the memoranda with respect to the allegations in the complaint, "Memorandum" refers to the revised memorandum, as well as the original.

4

83951313v.6

individuals, either of its own accord or upon request, rather than following the directives of the Memorandum.

24. However, in or about 2019, ICE first began to strictly follow the directives of the Memorandum, illegally retaining valid identification documents lawfully possessed by persons who were in removal proceedings, which in turn imposed impermissible burdens and barriers for individuals in removal proceedings. In fact, CLC staff did not become aware of the memorandum until July 2021 when it learned that its clients' documents were not being returned. J.T.M had no knowledge of the memorandum until after his documents were not returned, subsequent to his 2019 entry to the United States. Accordingly, before 2019, Plaintiffs had no knowledge of the Memorandum or that it was being used as a basis to retain migrants' documents.

25. Under ICE's current procedures, it may indefinitely hold valid documents belonging to individuals in removal proceedings based on the perfunctory conclusion that it has an operational need to do so.

26. ICE's retention of documents includes documents that are not necessary to effectuate removal proceedings and it extends to documents lawfully possessed by migrants who have been released from custody. Therefore, the Memorandum's reach extends well beyond retention of documents needed to carry out removal proceedings or reduce flight risks. In fact, in the case of non-detained migrants such as J.T.M., the government has already found they do not pose a flight or safety risk. *See* 8 C.F.R. §212.5(b) (providing that before paroling certain noncitizens, including asylum seekers in removal proceedings, the government must determine that such individuals "present neither a security risk nor a risk of absconding"). Therefore, the

83951313v.6

government's stated reason for retention of migrants' identify documents is illusory in the case of non-detained asylum seekers like J.T.M. and the members of the class.

27. Thus, ICE has held and continues to hold identification documents for aliens in removal proceedings who were lawfully permitted to have such documents without valid justification for doing so.

28. Plaintiffs have no objection to ICE retaining *copies* of the relevant documents, but the unlawful holding of the aliens' property violates the aliens' constitutional right to be free from unreasonable seizures of property and it has impeded their access to federal, state, and local government benefits to which they are entitled but for which the documents must be provided.

29. Government benefits, such as work authorization, are critical for the individuals seeking asylum to provide for themselves, their families, and to take root in the U.S. Without work authorization, aliens in removal proceedings are dependent on family, friends, and aid agencies, a burden that would not exist if they were able to timely obtain work authorization.

30. The individual class members, including J.T.M., have collectively requested the return of confiscated documents, despite the lack of defined procedures or parameters for doing so.

31. Instead of receiving their original documents as seized by ICE, the individual plaintiff-class members were made to seek replacement documents from their countries of citizenship at great cost of time, resources, and opportunities lost.

32. On April 30, 2019, a CLC client (who is a citizen of Honduras) entered the United States at the San Ysidro Port of Entry, after being placed in Migrant Protection Protocols (MPP). At that time, ICE confiscated her birth certificate, her children's birth certificates and her consular ID. These are all documents which the client was lawfully entitled to possess.

83951313v.6

33. The client subsequently applied for asylum and was eligible for work authorization on August 1, 2020.

34. On September 18, 2020, United States Citizenship and Immigration Services ("USCIS") denied the work authorization application for lack of government identification.

35. CLC was eventually able to obtain a replacement from the Honduran Consulate of the consular ID that was confiscated by ICE. This was submitted to USCIS in connection with the work authorization application on January 27, 2021.

36. The initial denial required that CLC expend resources to obtain a copy of the consular ID. In fact, in the summer 2020, faced with increasingly frequent instances in which its clients' documents had been seized and had not been returned, CLC needed to hire a social worker to assist clients with obtaining documents for their immigration applications, file police reports when victimized, and sign up for benefits. In the summer of 2020 CLC paid the social worker $4,133.55. In 2021, CLC paid the social worker $22,218.50. As a result of clients' documents being confiscated, a significant portion of the social worker's time, as well as that of CLC staff attorneys' time has been spent helping clients make appointments with consulates and writing individualized client letters to the consulates to obtain appointments. These expenditures of time and money would be unnecessary if ICE had returned the clients' documents, as it was required to do by law.

37. Further, the CLC's inability to retrieve client identification documents, and protracted delays in doing so, prevents CLC from closing existing matters or opening new cases. As a non-profit service agency, CLC has limited staff and resources. When its staff is occupied dealing with issues like trying to obtain the return of client documents, staff are unable to serve additional clients or take on new matters.

38. For example, CLC diverts resources to helping clients apply for new documents, including passports, from consulates. Not only does this increase the unmet need from CLC's client base, but it also reduces the amount of grant money CLC is eligible for due to an inflated number of open matters. CLC currently has numerous open matters that would be closed but for pursuit of the documents retained by ICE.

39. J.T.M. is married and has four children. He fled Mexico because 2 cartels entered J.T.M.'s hometown in a rival gang war, kidnapping and killing the inhabitants.

40. J.T.M. entered the United States at the El Paso, Texas Port of Entry on September 26, 2019. At this time, unknown agents or contractors of ICE confiscated his birth certificate and consular identification.

41. J.T.M. and his family are clients of CLC. With CLC's assistance, J.T.M. applied for asylum for himself and his children on December 7, 2020. Those claims are pending in the Chicago Immigration Court and J.T.M. is awaiting a Master Calendar Hearing.

42. As a result of his asylum application, J.T.M. was eligible for work authorization on June 12, 2021. Under the applicable rules he would have been permitted to submit his application on May 13, 2021.

43. However, his application was incomplete, such that he could not submit it, because he lacked any passport or consular identification and he was unable to timely obtain a replacement passport or consular identification because there is no Mexican Consulate near his home in Wisconsin. J.T.M. had to travel to the Mexican Consulate in Minnesota to obtain his passport.

44. J.T.M. was finally issued his passport on August 17, 2021 and Children's Legal Center is working to finalize forms and submit the application for work authorization.

45. This delay caused J.T.M. significant hardship in that he could not support his wife and family. J.T.M., his wife and his children were forced to reside with his father-in-law who is a United States Citizen and provided the family with food and shelter.

46. Without work authorization, J.T.M. could not provide for personal expenses such as visits to doctor's offices. Further, J.T.M. initially did not enroll his children in school because he was unable to afford a doctor's visit for the required physical examinations. Although J.T.M.'s children have since been enrolled school, the school continually provides notice to J.T.M. that the children need physical exams by a doctor. In addition, J.T.M.'s children are from Mexico and are unaccustomed to the cold weather experienced in Wisconsin where they now reside. Thurs, during the winter the children have experienced seasonal sickness such as the flu. The children have had fevers and symptoms but J.T.M. and his wife cannot afford to take their children to the doctor when they are sick. Additionally, without work authorization, J.T.M. cannot afford other basic personal items such as clothing and school supplies for his children

47. The harm inflicted by ICE's improper seizure and retention of property is not limited to the individual Plaintiffs. Indeed, the CLC and other similar agencies must regularly expend additional resources that they would not otherwise expend as a result of this policy.

48. For example, CLC's employees must spend additional time and resources seeking return of documents that should already have been returned. This limits CLC's ability to serve additional clients who otherwise would qualify for CLC's services.

## CLASS ALLEGATIONS

49. The Memorandum was not functionally effective, impacting migrants, and warranting investigation by Plaintiffs, before 2019. After that point, each act of enforcement of the policy constituted a separate act collectively making up an unlawful practice.

9

50. Specifically, ICE's separate acts of seizing and retaining the personal identification documents of migrants under the Memorandum's directive constitute a continuing violation of Plaintiffs' Fourth and Fifth Amendment rights.

51. Additionally, a class member whose documents were not seized and retained could not bring an action challenging the seizure and/or retention of the documents before such documents were seized and retained.

52. Plaintiffs bring these claims on behalf themselves and of all others similarly situated. This treatment is appropriate because Plaintiffs meet the requirements of Fed. R. Civ. P. 23.

53. Plaintiffs propose the following three subclasses:

   a. All individuals seeking asylum in the United States of America who are in removal proceedings and who have been unable to submit complete applications for work authorization because ICE has retained their identification documents;

   b. All individuals seeking asylum in the United States of America who are in removal proceedings and whose work authorization applications have been denied or delayed due to a lack of identification documents, provided that ICE has retained the identification documents.

   c. All non-profit agencies located in the United States of America that have expended resources assisting individuals in either of the preceding subclasses.

54. ICE's policy applies to all non-detained individuals seeking asylum in removal proceedings. Accordingly, the classes are sufficiently numerous that joinder is impracticable.

55. Similarly, there are questions of law and fact that are common to the class. In particular, whether ICE has discretion to indefinitely hold identification documents legally possessed by their bearers, whether the lack of criteria regarding retention is unreasonable, and whether the lack of criteria means that ICE's determinations are arbitrary and capricious.

10

56. The claims of the proposed class representatives are typical of the claims of the class because the representatives have suffered similar harm from the implementation of the Memorandum, including inability to apply for work authorization as permitted by law and denial of otherwise valid applications of authorization.

57. The proposed class representatives will fairly and adequately protect the interests of the class because ICE has acted similarly with respect to all class members and because Plaintiffs are not subject to unique individualized defenses that would destroy commonality or typicality.

58. In addition, certification is appropriate under multiple subsections of Fed. R. Civ. P. 23(b).

59. Certification is proper under Fed. R. Civ. P. 23(b)(1) because "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class," in particular with respect to document retention determinations. If each class member were to bring individual claims, ICE might face a host of incompatible requirements for adjudicating document return requests.

60. Certification is proper under Fed. R. Civ. P. 23(b)(2) because ICE has acted based on the Memorandum, which applies generally to the class. Accordingly, class-wide injunctive relief is appropriate to remedy the unlawful actions.

61. Certification is proper under Fed. R. Civ. P. 23(b)(3) because there is a question of law common to class members—chiefly whether ICE's policy of identification document seizure violates the Fourth Amendment. Litigating this issue through a class action is vastly superior in light of judicial efficiency and economy to the separate adjudication of thousands of duplicative lawsuits.

## CLAIMS

### Count I: Declaratory and Injunctive Relief and Against All Defendants
### Fourth Amendment - Unlawful Seizure

62. Each of the foregoing paragraphs is incorporated as if fully restated herein.

63. The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Am. IV.

64. ICE's policy and its implementation violate the Fourth Amendment because ICE has retained Plaintiffs' documents and the documents of Plaintiffs' clients indefinitely, unreasonably, and without probable cause.

65. Instead, ICE has instituted a standard-less policy of discretion allowing it to retain the documents without meaningful review.

66. Defendants can reasonably achieve their stated purpose of ascertaining the asylum seekers' identity and performing background checks by retaining photocopies or scanned copies of the seized identification documents. Additionally, Defendants perform background checks on, and fingerprint, noncitizens entering the United States at the border.

67. Further, Defendants cannot in good faith allege that allowing migrants to retain identification documents *prevents* the migrants' "appearance of legitimacy" while residing in the U.S.

68. Plaintiffs are only precluded from the return of their original documents, while being free to seek replacement documents from their countries of citizenship. Functionally, this enables asylum-seekers, even those who may ultimately be deported, to reside in the U.S. with legitimate documents from their countries of citizenship. Indeed, Plaintiffs in this matter only challenge ICE policy as to documents to which they are legally entitled.

12

69. Thus, the Memorandum serves **only** to compel asylum-seekers to expend unnecessary time, resources, and loss of opportunity to obtain new identification documents, regardless of whether such documents create an impression of "legitimate presence".

70. Among the confiscated documents are passports, birth certificates and consular identification documents, all of which are legitimately held by noncitizens, regardless of legal status.

71. Additionally, the individual members of the plaintiff-class are asylum seekers who are permitted by statute to live and work in the U.S. pending approval of their asylum applications.

72. ICE's seizure and retention of the asylum seekers' identification documents compromises their reasonable ability to live and work in the U.S. in a productive fashion and in accordance with the applicable law.

73. Defendants' insistence on retaining all original copies of the identification documents impedes Plaintiffs' ability to obtain housing, work authorization, enroll their children in school, and seek other benefits to which they are legally entitled. This renders the seizure unreasonable under the Fourth Amendment

74. As a direct result of this unconstitutional conduct, Plaintiffs have suffered damage, including a deprivation of benefits guaranteed under law.

### Count II: Monetary Relief Pursuant to *Bivens* Fourth Amendment - Unlawful Seizure

75. Each of the foregoing paragraphs is incorporated as if fully restated herein.

76. Plaintiffs bring this count against the John Doe Defendants in their personal capacities.

77. The John Doe Defendants have unlawfully retained Plaintiffs' documents and the documents of Plaintiffs' clients indefinitely, without probable cause.

78. In particular, Defendants have acted despite clearly established law that provides that indefinite seizures of lawfully held property violates the Fourth Amendment.

79. As a direct result of this unconstitutional conduct, Plaintiffs and other class members have suffered damages, including a loss of wages from being unauthorized to work and other physical, emotional, and economic harm.

### Count III: Declaratory and Injunctive Relief and Against All Defendants Pursuant to the Administrative Procedure Act

80. Each of the foregoing paragraphs is incorporated as if fully restated herein.

81. The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

82. The APA permits the Court to review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

83. ICE's decision to retain Plaintiffs' documents pursuant to the Memorandum is a final agency action because there is no avenue for further review of the decision.

84. Additionally, there is no adequate remedy to challenge the retention.

85. Further, the decision to retain documents without a proper standard governing the agency conduct is arbitrary and capricious. Therefore, the conduct of ICE in retaining documents rightfully held by Plaintiffs and other class members violates the APA.

### Count IV: Declaratory and Injunctive Relief and Against All Defendants Fifth Amendment - Deprivation of Property Without Due Process of Law

86. Each of the foregoing paragraphs is incorporated as if fully restated herein.

14

87. The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. Am. V.

88. ICE's policy and its implementation violate the Fifth Amendment because ICE has retained Plaintiffs' documents and the documents of Plaintiffs' clients indefinitely, without providing meaningful procedures (either pre- or post-deprivation) to allow for the return of these documents.

89. ICE's policy and implementation lacks such procedures, even when Plaintiffs and other class members are lawfully entitled to the seized documents.

90. ICE has not communicated or identified public-facing procedure to facilitate return of the seized documents and the memorandum does not contain such a procedure.

91. ICE's internal three-factor analysis to determine whether document return is appropriate does *not* describe the procedures for how Plaintiffs should request return of their documents in the first instance. Instead, Plaintiffs' experience in practice is that any "process" that does exist is disorganized, ad hoc, and intended to frustrate legitimate interests of migrants.

92. Because of Defendants' efforts to impede the return of documents to which Plaintiffs are entitled, Plaintiffs' are forced to expend extensive time and resources, sacrificing opportunities for work and public benefits, while navigating the nebulous "process" of document retrieval.

93. ICE's standard-less policy of discretion allowing it to retain the documents without meaningful review of the seizure.

94. The Memorandum thus creates a situation whereby migrants are deprived of identity documents they are entitled to possess and are impeded in gaining access to government benefits to which they are lawfully entitled.

95. Therefore, the Memorandum and ICE's implementation of it constitutes a seizure in violation of the due process protections of the Fifth Amendment.

96. As a direct result of this unconstitutional conduct Plaintiffs and other class members have suffered damage, including a deprivation of benefits guaranteed under law.

WHEREFORE, Plaintiffs ask this Court to enter a judgment in their favor on all claims and award the following relief:

a. Certification of the classes described above;

b. A declaration that the Memorandum and its implementation violate Plaintiffs' and the classes' rights under the Fourth and Fifth Amendments and an injunction barring Defendants from relying on it in determining whether to return Plaintiffs' and the classes' documents;

c. A declaration that the Memorandum and its implementation are arbitrary and capricious under the APA and an injunction setting aside the Memorandum;

d. An injunction directing Defendants to return Plaintiffs' and the classes' documents held unlawfully in violation of the Fourth and Fifth Amendments and pursuant to arbitrary and capricious action;

e. Compensatory damages for the deprivation of property and damages caused by the Defendants' violations of Plaintiffs' and the classes' Fourth Amendment rights;

f. Punitive damages to sanction the Defendants' knowing violation of the Fourth Amendment and to deter others from engaging in similar conduct;

g. Any other relief which this Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims so triable.

| | |
|---|---|
| **DATED: June 6, 2022** | Respectfully submitted,<br><br>J.T.M.<br>CHILDREN'S LEGAL CENTER<br><br><br>By: /s/ *Ian H. Morrison*<br>      One of Their Attorneys |

Ian H. Morrison
Jules A. Levenson
Ala Salameh
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone:   (312) 460-5000
Facsimile:   (312) 460-7000
*Attorneys for Plaintiffs*

17

83951313v.6